CARLYLE STURM AND CHARLOTTE STURM, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sturm v. Commissioner
Docket No. 26723-83.
United States Tax Court
T.C. Memo 1987-625; 1987 Tax Ct. Memo LEXIS 670; 54 T.C.M. (CCH) 1394; T.C.M. (RIA) 87625; December 30, 1987. Thomas F. Topel, J. Marquis Eastwood, Kenneth L. Cutler, and Maureen H. Parkinson, for the petitioners. Randall G. Durfee and Joel A. Lopata, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies in petitioners, [1] Federal income tax liability as follows: *671 Year
Deficiency
1979
$ 67,658.00
1980
$ 39,067.00
The primary issues for our determination are whether petitioner's transactions with respect to certain computer equipment were structured as a tax-avoidance scheme devoid of economic substance which should be disregarded for Federal income tax purposes and whether petitioner acquired the benefits and burdens of ownership. Subsidiary issues for our determination are: (1) whether the ownership interest acquired by petitioner, if any, was a future interest; (2) whether petitioner was entitled to deduct certain interest paid with respect to certain promissory notes and an agreement of assumption; (3) whether petitioner was at risk within the meaning of section 465 [2] with respect to certain promissory notes and an agreement of assumption; (4) whether petitioner was entitled to elect the modified half-year convention *672 method of depreciation for the taxable year 1979 and whether petitioner was entitled to use the double declining balance method of depreciation; and (5) whether petitioner is liable for an additional interest amount determined pursuant to section 6621(c). [3]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided within the state of Montana at the time their petition herein was filed. Petitioner received a Ph.D. degree in business and economics from the University of Wisconsin in the year 1940. Petitioner is a semi-retired business insurance consultant, licensed in *673 Montana. During the year 1979, in a transaction that is the subject of this action, petitioner purchased [4] from Finalco, Incorporated ("Finalco"), certain computer equipment manufactured by Honeywell Information Systems, Inc. ("Honeywell"). Petitioner and Finalco entered into a Lease Agreement which provided that petitioner would lease the acquired computer equipment back to Finalco for a period of 84 months commencing April 30, 1979. Finalco
Finalco is the principal subsidiary of Finalco Group, Inc., formerly Financial Analytics Corporation, a publicly-held corporation, the stock of which is traded over-the-counter *674 and reported in NASDAQ quotations. The principal offices of Finalco and Finalco Group, Inc., are located in McLean, Virginia. During the years in issue, Finalco was a closely-held company. During the years in issue, Finalco typically engaged in leasing transactions involving electronic data processing equipment in which Finalco negotiated and entered into a lease with an end-user, purchased the equipment, financed the purchase with a lending institution, and resold the equipment in a sale and leaseback transaction with an independent third party. The resale of the equipment provided Finalco with much of the capital necessary to generate additional lease transactions. In addition to generating transactions through its own marketing programs, Finalco also acquired equipment subject to existing end-user leases from other leasing companies. During its fiscal year ending June 30, 1979, Finalco entered into lease transactions of approximately $ 129,000,000 based on the original cost of equipment. John F. Olmstead ("Olmstead") was president of Finalco at the time petitioner entered into the transaction. Lease Pro, Inc.
Lease Pro, Inc. ("Lease Pro") is a Montana corporation *675 engaged in the purchase, sale and leasing of computer equipment. Lease Pro has served as a general partner in a partnership that leases personal property, other than computer equipment, and owns an interest in a leased building. During the years in issue, Lease Pro was owned by J. L. DuBois ("DuBois") and Dean Schennum ("Schennum"). DuBois acted as the sales agent at Lease Pro. Schennum acted as business manager and administrator. DuBois and Schennum are also the principals in DuBois-Schennum Assoc., Ltd., a Montana corporation organized in August of 1980, and registered with the National Association of Securities Dealers ("NASD") for the purposes of acting as a broker-dealer. Lease Pro acted as sales agent for Finalco in the pursuit to locate investors. Lease Pro received a commission in the amount of ten percent of the equity investment, including cash and any recourse note. During 1979 and 1980, Lease Pro's revenue attributable to Finalco arranged computer lease transactions approximated 90 percent of all revenue it earned. Lease Pro had no shareholders, officers, directors, or employees in common with Finalco Group, Inc., its affiliates, or subsidiaries. Equipment Acquisition *676 by Finalco
Honeywell agreed to sell certain computer equipment to Finalco for the purpose of leasing such equipment to Ford Motor Company ("the end user") for use at various facilities. A Sale Agreement ("the Honeywell Sale Agreement") executed by Finalco and Honeywell, which was dated April 30, 1979, by Finalco and dated July 12, 1979, by Honeywell, separately described in schedules thereto 18 computer systems to be installed at 18 different Ford facilities. Finalco and Honeywell acknowledged by separate agreement ("Amendments to Honeywell Sale Agreement") executed by each party contemporaneously with the Honeywell Sale Agreement that the effective date of the Honeywell Sale Agreement was April 30, 1979. The Honeywell Sale Agreement provided that title to units of equipment would pass on the date the unit of equipment was shipped by Honeywell or if installed equipment being converted to purchase, on the last day of the month that any existing Honeywell lease agreement terminates. The Honeywell Sale Agreement provided that Honeywell maintain insurance for risk of loss or damage to the equipment for a period of 60 days after shipment or until the equipment was installed and ready *677 for use, whichever occurs first. Finalco acquired the computer equipment included in the Honeywell Sale Agreement for the sum of $ 7,083,424 as evidenced by a Bill of Sale ("the Honeywell Bill of Sale") dated April 30, 1979. The computer equipment was installed at 18 different Ford facilities. The Honeywell Sale Agreement included certain computer equipment ("the Equipment") installed at a Ford facility located in Claycomo, Missouri. The Honeywell list price of the Equipment was $ 840,797 as evidenced in the Honeywell customer invoice dated July 30, 1979. The net price Finalco paid for the Equipment was the amount of $ 522,704. The Equipment included both new and used computer equipment. Finalco paid the Honeywell list price of $ 297,030 for new Equipment. Finalco paid $ 225,674 for the used items of the Equipment, an amount of approximately 41 percent of the Honeywell list price. The used Equipment had been installed at the End User location on December 19, 1974. The Honeywell Sale Agreement misidentified an item of the Equipment acquired by Finalco as follows: List
Net
Quantity
Model #
Description
Price
Purchase
1
CPS 6203
64K Memory
$ 105,360
$ 38,467
Increment
*678 The above model number should have indicated model number CNK 6002, however the other data is accurate. Model number CPS 6203 is a Central Processor which at the time of the transaction commanded a list price in the approximate amount of $ 848,000. The Honeywell Bill of Sale adopted the misidentified model number and altered the description to indicate that a Central Processor was included as part of the Equipment purchased by Finalco. The Honeywell customer invoice also reflects the erroneous CPS 6203 model number and Central Processor description; however, the Honeywell customer invoice correctly billed Finalco the amount of $ 105,360 which is the list price amount of model number CNK 6002 described as a 64K Memory Increment. The 64K Memory Increment was in fact an item of computer equipment acquired by Finalco as part of the Equipment. [5]
*679 Finalco leased the equipment to the End User pursuant to a lease agreement between Finalco and the End User dated April 30, 1979 ("End User Lease"). The End User Lease had an initial term of 48 rental installments. The End User Lease was a typical commercial triple net lease. With respect to the Equipment leased as a component of the End User Lease, Ford agreed to pay Finalco one rental installment of $ 22,554 (three times $ 7,518) for the months of February, March, and April on April 30, 1979, followed by 48 rental installments commencing May 1, 1979. The first 18 rental installments are each in the amount of $ 7,742, and the remaining 30 rental installments are each in the amount of $ 16,133. Upon the expiration or termination of the End User Lease, the End User was obligated to deliver the equipment to a location specified by the lessor, at the expense of the End User. The End User Lease gives the End User an upgrade option; a termination option after 36 months allowing the End User to terminate the End User Lease by paying a termination value equal to the original acquisition financing multiplied by a percentage that decreases with time; and an option to purchase the equipment *680 at a price equal to the greater of the then-current fair market value or the termination value increased by 15 percent. The computer equipment subject to the End User Lease was placed in service as of April 30, 1979. To provide the purchase money financing, the Philadelphia Savings Funds Society (the "Bank") loaned EDP Investments, Inc. ("EDP"), a wholly owned subsidiary of Finalco Group, Inc., and a sister corporation to Finalco, a total of $ 9,789,477.21 evidenced by 19 secured promissory notes dated August 3, 1979, issued by EDP to the Bank. One secured note was issued in the principal amount of $ 7,283,457.21 and 18 other secured notes, referred to as "Seller's Notes," were issued in the total principal amount of $ 2,506,020. One such Seller's Note was issued in the principal amount of $ 160,750 (the "Sturm Seller's Note"). All such secured notes were nonrecourse and provided that interest be paid at the rate of 10.2 percent per year. y
EDP loaned Finalco $ 9,789,477.21, and Finalco issued a promissory note to EDP, dated August 3, 1979, in the amount of $ 9,789.477.21 which EDP assigned to the Bank. As security, Finalco agreed to assign to EDP certain installment notes, *681 security agreements and leases executed by individuals purchasing the computer equipment covered by the Honeywell Sale Agreement including the Sturm Equipment from Finalco. As security for the purchase money financing, EDP, Finalco and the Bank executed a Security Agreement, dated August 3, 1978, in which EDP and Finalco granted to the Bank their security interest in the Sturm Equipment, title to which had been transferred to petitioner, and interest in all proceeds, notes and leases related to the sale of the Sturm Equipment to petitioner and lease to the End User. Entry Into Transaction
Petitioner sold his insurance business to Rollins, Burdick, Hunter ("RBH"), a Chicago based company on June 27, 1979, in exchange for stock and a five-year employment contract with RBH. Petitioner's accountant, Robert Murray ("Murray"), advised petitioner and prepared financial statements in connection with the sale of petitioner's insurance company. Petitioner and Murray discussed financial planning strategies that would supplement retirement income in five years after the expiration of his employment contract. Murray suggested an investment in a leveraged computer lease transaction *682 involving Finalco. According to Murray, the reason he suggested an investment in a leveraged computer lease transaction was because of the tax deferral during the initial five years of the lease agreement with some expectation of residual value at the termination of the lease agreement. Murray did not discuss the personal liability aspects of the recourse note and the assumption agreement aspect of the transaction. The description of the Equipment was not provided to Murray prior to petitioner's entry into the transaction such that neither Murray nor petitioner were aware of the Equipment acquired. Neither petitioner nor Murray investigated the End User or the term of the End User Lease. Murray did not appraise the fair market value of the Equipment nor seek an independent appraisal of the residual value. Murray had represented other clients who had invested in leveraged lease programs arranged by Finalco and he had personally purchased such a program. Based on his prior experience with Finalco, Murray relied solely on the representation of Finalco and DuBois that both the purchase price and the projected residual value were reasonable. Murray introduced petitioner to DuBois, *683 of Lease Pro, for the purpose of discussing Finalco's arranged leveraged lease programs. DuBois had acted as a sales agent for Finalco and had directed the placement of many types of investments. DuBois discussed with Murray and petitioner the computer leasing transactions, the projection, and the anticipated income from lease renewals of the computer equipment and the income anticipated from residual value. DuBois represented that petitioner could anticipate receipt of approximately 125 percent of the equity investment of $ 68,000, or $ 85,000, solely from the residual value of the equipment. DuBois also represented that petitioner could anticipate the receipt of 20 percent of the total purchase including renewal proceeds and resale proceeds, of approximately $ 104,000. DuBois did not obtain outside appraisals of the Equipment, but relied solely on the values determined by Finalco. [6]
DuBois gave petitioner a projected profit and loss statement for the proposed investment for the years 1979-1986, inclusive *684 (the "Projection"). The Projection, prepared by Finalco, assumed that the owner of the Equipment would depreciate the Equipment under the Class Life Asset Depreciation Range system, electing the modified half-year convention and the 200 percent declining balance method of depreciation with a seven-year useful life for the new component of the Equipment and the 150 percent declining balance method and a five-year useful life for the used component of the Equipment. The depreciation expense calculated by Finalco for 1979 was $ 152,568. The after-tax savings from the time of investment in 1979 through 1983 was projected to be $ 164,382. The tax that would be due on profits from 1984 through 1986 was projected to be $ 111,489, yielding an overall tax savings of $ 52,893. The Projection assumed an equity investment of $ 68,000, which is greater than the overall tax savings of $ 52,893. The Projection indicated that DuBois orally communicated to petitioner to expect Finalco to generate $ 100,000 of annual renewal income for the period 1984 through 1986 and that petitioner could expect 50 percent of such amount commencing May 1, 1984. [7]
*685 Petitioner did not seek an independent appraisal of the fair market value or residual value of the Equipment. Petitioner did not consult his attorney to review the transaction documents. With respect to equity investments, petitioner principally relied on the investment advice of Richard Spaulding ("Spaulding") a stock analyst with the firm of Merrill Lynch. Spaulding advised petitioner that Merrill Lynch did not recommend leveraged computer leases due to the risk of obsolescence inherent in the computer industry and the resultant uncertainty of residual value. In this regard, Spaulding supplied petitioner with a brochure which detailed the view of Merrill Lynch concerning leveraged computer leasing. Petitioner was not familiar with either computer technology or computer products. Petitioner was unaware as to whether the Equipment included a central processor unit as was incorrectly specified in the equipment schedule provided at the time of purchase. At trial petitioner was not aware of the purpose or approximate value of a central processor unit in comparison to the peripheral items of the Equipment. Petitioner relied solely on DuBois as to both the fair market value and *686 residual value of the Equipment, including any renewal proceeds to be expected during the term of the lease and the determination of the amount thereof. As evidenced by an internal memorandum, on June 4, 1979, Finalco began to prepare the documentation necessary to complete petitioner's purchase of the Sturm Equipment. According to petitioner, the transaction was contingent on the sale of his insurance business to RBH. The Transaction
The Purchase Agreement between petitioner and Finalco, dated April 15, 1979 (the "Purchase Agreement"), provided that petitioner would purchase the Equipment from Finalco, subject to the End User Lease, for a total purchase price of $ 522,704 payable as follows: Full Recourse Promissory Note
$ 68,000 Nonrecourse Installment Note
293,954
Assumption of Sturm Seller's Note
160,750
TOTAL
$ 522,704
The Purchase Agreement permitted Finalco to encumber the equipment for the purpose of financing its initial acquisition. Finalco represented that the rent payable under the End User Lease during the non-cancellable term thereof would equal or exceed the principal and interest accuring under such encumbrance. Petitioner *687 signed a recourse Promissory Note and Security Agreement in favor of Finalco, dated April 15, 1979, in the amount of $ 68,000, with interest on the unpaid balance of 11 percent per annum (the "Recourse Note"). The Recourse Note provided for a down payment of $ 12,000 on June 1, 1979, and four annual payments of $ 14,000 plus accrued interest on each June 1 thereafter. [8] All documentation related to the transaction was signed by petitioner by June 28, 1979, except an Agreement of Assumption, relative to the assumption of the Sturm Seller's Note, which was signed July 31, 1979, and Remarketing Agreement which was signed in October of 1979. Petitioner also signed the nonrecourse Installment Note in favor of Finalco, dated April 15, 1979, in the amount of $ 293,954 (the "Installment Note"). The Installment Note provided that interest would be paid at *688 the rate of 10.2 percent per annum. The Installment Note provided for 84 monthly payments -- $ 3,254.20 for the first 45 months and $ 7,531.68 for the remaining 39 months and further provided that in the event of default by petitioner the holder of the Note could declare the entire amount immediately due and payable. To secure the amounts due under the Installment Note, petitioner granted Finalco a security interest in the equipment. Pursuant to an Agreement of Assumption dated July 31, 1979, petitioner assumed the Sturm Seller's Note in the amount of $ 160,750 issued by EDP in favor of the Bank. The assumption by petitioner was sent to, accepted and acknowledged by the Bank. The Sturm Seller's Note required 44 monthly payments of $ 4,393.18, and its assumption was required by the Purchase Agreement as part of the purchase price. Leaseback to Finalco
Simultaneously, upon petitioner's purchase of the equipment, petitioner and Finalco entered into a Lease Agreement, dated April 15, 1979, providing that petitioner would lease the equipment back to Finalco beginning on April 30, 1979 (the "Owner Lease"). The term of the Owner Lease was 84 months, commencing April 30, 1979 (the *689 "Original Term"). The monthly rental was $ 7,625.02 per month; however, during the first 45 months of the Owner Lease the monthly rental payable by Finalco would be reduced to $ 3,347.54 provided the End User made its regular monthly rental payment of $ 4,277.48 which was assigned to petitioner as collateral for the Owner Lease. The monthly rent due from Finalco to petitioner was sufficient to amortize the Installment Note obligation and to generate $ 93.33 of cash flow to petitioner during the Owner Lease. Finalco credited petitioner with rental payments beginning April 30, 1979, and petitioner recognized such payments as income. At the expiration of the Owner Lease, Finalco was required, at its expense, to deliver the Equipment to petitioner or his designee, in its original condition. Finalco was granted an option to renew the Owner Lease at the then fair market rental value. The Owner Lease gave Finalco certain other options. Finalco was entitled to terminate the Owner Lease after 12 months by paying a termination value (which was a multiple of the purchase price, depending upon the time of termination) only if the End User terminated its lease. Finalco could purchase the *690 Equipment from petitioner after the expiration of the Original Term at fair market value; and purchase the Equipment from petitioner during the Original Term only if the End User had and exercised an option to purchase the equipment from Finalco. In such case, the price would be the greater of the termination value or fair market value plus any and all sales, use or other taxes due as a result of the exercise of the option. Finalco could exchange the Equipment if Finalco gave petitioner title to equipment of equal fair market value. Finalco could renew the Owner Lease at fair market rental value. In addition to remedies available at law or equity, the Owner Lease provided remedies upon default. Upon default by petitioner, Finalco could terminate the lease by paying the scheduled termination value and redelivering the equipment to petitioner. Upon default by Finalco, petitioner could declare the exercise of the termination option by Finalco; sums accrued and unpaid would become due and petitioner would have the option to terminate the Owner Lease, take possession of the equipment, re-lease the equipment, or sell the equipment, and apply the proceeds to Finalco's obligation under *691 the Owner Lease. Remarketing Agreement
In connection with the purchase and leaseback transaction with Finalco, petitioner also executed a Remarketing Agreement dated April 15, 1979. In the Remarketing Agreement petitioner agreed not to sell the Equipment during the Original Term of the Owner Lease without the consent of Finalco. Petitioner granted to Finalco the "express right" to sell equipment for petitioner at any time during the Owner Lease and to execute any renewals. Petitioner granted Finalco a right of first refusal to match the terms of any sale or any offer for the equipment not referred by Finalco. The Remarketing Agreement is cast in the form of a brokerage agreement subject to commission; however, the substance of the Remarketing Agreement is that petitioner must rely on Finalco to remarket the equipment such that a fair inference is that Finalco had an exclusive interest in remarketing efforts. Remarketing services are defined to include: (i) renewals under the lease; (ii) purchase of equipment by lessee, (iii) referral of a willing lessee or buyer at fair market value or fair rental value. Residual Revenue is defined as "any and all sums received: *692 (i) from use of the Equipment in excess of or in addition to the rentals due during the Original Term of the Lease; (ii) from sale of the Equipment during the Original Term of the Lease; or (iii) in excess of or in addition to any termination or substitution value if such is paid pursuant to the Lease." (Emphasis added.) The Owner Lease provided for Finalco to pay petitioner $ 7,070.25 per month during the Original Term. The 48-month End User Lease provided that the End User pay Finalco $ 16,133 per month during the last 30 months of the End User Lease Term. Residual Revenue shall be allocated as follows: (a) Renewals: after the sixtieth month of the Original Term of the Owner Lease, 50 percent of Residual Revenue from renewals to petitioner and the remainder to Finalco; (b) Sales: petitioner receives all proceeds until he has received 120 percent of his net equity, then 30 percent of the sale proceeds go to Finalco and 70 percent to petitioner. [9] Net equity is defined as the sum of (a) the cash down payment and (b) the original balance of the recourse note, less (c) all cash flow distribution up to the time of sale. According to Olmstead, Finalco calculated "all *693 cash flow distributions up to the time of sale" to be the amount of any cash distributed to petitioner in excess of the corresponding installment note payments due by petitioner. Even though Finalco is entitled to receive payment pursuant to the Remarketing Agreement only if Finalco is responsible for the sale or renewal of the Equipment, the reality of the transaction is such that petitioner must rely on Finalco for remarketing efforts. *694 By letter dated August 5, 1983, Finalco advised petitioner that the End User renewed its lease beyond the initial 48-month term at $ 7,070.35 per month for 20 months. [10] The letter also advised petitioner that Finalco construed the terms of the Remarketing Agreement to entitle petitioner to receive 50 percent of said renewal proceeds for an eight-month period commencing May 1, 1984. Petitioner received from Finalco a total of $ 28,281.40 for the last eight months of 1984. [11] By letter dated January 15, 1985, petitioner was advised that the End User again renewed its lease through April 1, 1985. Petitioner received $ 10,605.54 from Finalco in 1985. The Equipment was not re-leased after termination by the End User on April 1, 1985, and was stored at a Finalco warehouse. The End User had extended the lease due to difficulty encountered in the conversion to the IBM 4331 computer system. *695 Finalco Document Dating Practices
Although petitioner signed the Purchase Agreement and other related documents including the leaseback documents on June 28, 1979, the documents bore the date of April 15, 1979. The documents were prepared and packaged by Finalco. According to Olmstead, Finalco dated documents transferring title to the investors on or before the end user lease so that banks which financed the acquisition of the computer equipment would have a first perfected security interest in the equipment. According to Olmstead, Finalco did not date documents in a year prior to the tax year in which the investor purchased the equipment or, if the investor purchased the equipment in the last half of the tax year, Finalco did not date such documents in the first half of the tax year in order to comply with the modified half convention method of depreciation. Despite the fact that Finalco was aware that petitioner signed the Purchase Agreement on June 28, 1979, Finalco warranted that petitioner would be entitled to treat the cost of certain items of the Equipment as new equipment for purposes of the double declining balance method of accelerated depreciation. Petitioner *696 agreed to file an election to pass the Investment Tax Credit ("ITC") through to Finalco and signed the election, dated April 15, 1979. The election stated that possession of the Equipment was transferred on April 30, 1979. Finalco signed a similar election, passing ITC through to the End User, dated February 12, 1980. By Bill of Sale date April 30, 1979, Finalco transferred all its rights, title, and interest in the equipment to petitioner. The Equipment and Industry Conditions
The Equipment contains peripheral equipment for the Honeywell Series 60 Level 66/20 Computer Systems ("Honeywell 66/20") which was introduced in April of 1974. [12] Honeywell acquired the General Electric computer line in 1970. Honeywell encountered difficulty producing a unified product combining the desired features of each computerline. The Honeywell 6000 Series was announced in 1971 but used peripheral equipment developed by General Electric for the GE600 Series. The Honeywell Series 60 was developed to compete with the IBM 370 Series which was introduced in 1971. The Honeywell Series 60 presented new Honeywell peripheral equipment; nonetheless, the state-of-the-art specifications were comparable *697 to the IBM 370 which had been on the market for three prior years. The Honeywell Series 60 was intended to serve as an upgrade product to the Honeywell 6000. The IBM 370/138 was introduced as an enhanced IBM 370 Series product in June of 1976. Honeywell responded with the enhanced Honeywell Series 60 Level 66/DPS ("the Honeywell 66/DPS") in September of 1978. In January of 1979, IBM announced the IBM 4300 ("the IBM 4300") which presented a dramatic increase in price/performance capability far in excess of the industry expectations. The IBM 4300 depressed the expected residual values of existing computer equipment. *698 The market for third party leasing of computer equipment developed rapidly in the 1970's. Projections of residual value are critical to evaluate an investment in computer equipment. Such projections vary among experts and fluctuate with market conditions. Computers do not depreciate with age, but rather are subject to technological obsolescence. Because IBM dominates the computer industry, the technological advancements of IBM products have significant impact upon the residual value of progenitors. Industry experts have had varied success in the ability to predict technology advancements of IBM. The volume of used computer equipment transactions can be discerned from the advertisement of the weekly trade journal Computer World. IBM has the largest market share and IBM computer prices are evidenced in the Computer Price Guide ("The Blue Book"). [13] In 1979, Computer World referenced few Honeywell used computer advertisements.
*699 Honeywell was a competitor during such period. In 1975, Honeywell adopted an unprecedented policy intended to control the secondary sale of Honeywell equipment. Honeywell restricted the relicense of computer software to secondary purchasers of Honeywell central processors and charged substantial fees for engineering and standard maintenance as well as software relicensing. Honeywell desired to control the secondary sale of Honeywell equipment by limiting the use of support services and computer software. These costs imposed by Honeywell upon dealers or users of Honeywell equipment in the secondary market exceeded the standard established by IBM to acquire and maintain comparable IBM equipment. In 1975, Honeywell agreed to exempt Finalco and subsequent owners of Honeywell computer equipment acquired from Finalco from the restriction on the transfer of licensed Honeywell software. ("The Honeywell-Finalco Software Agreement"). Honeywell and Finalco had an extensive business relationship since the founding of Finalco in the year 1968. Some Finalco programs included Honeywell residual participation and Honeywell provided financing for some Finalco acquisitions. The Amendment to *700 the Honeywell Sale Agreement provides that: All references to software products and computer programs in Exhibit A to the [Honeywell] Sale Agreement are hereby deleted, since Honeywell will directly license software products to Ford AAD. Honeywell agrees, that upon request of Finalco at any time in the future, it will license any of its then current software products and provide any other items or materials required to make the Equipment operational to Finalco or its assignee or subsequent purchasers or lessees from Finalco, pursuant to Honeywell's then current terms, prices and conditions. Finalco and certain Honeywell users developed a network to provide maintenance specialists to service Honeywell equipment acquired from Finalco. The maintenance function network was incorporated in 1978 and coordinated the maintenance functions among various Honeywell users and published a Honeywell user newsletter. Expert Testimony of Fair Market Value
S. Paul Blumenthal ("Blumenthal") was qualified to testify as an expert on behalf of petitioner. Blumenthal is a senior vice president of American Computer Group and is the senior corporate officer of American Technology Appraisal *701 Service ("ATAS"), a special valuation consulting division of American Computer Group. [14]
Blumenthal opined that the fair market value of the Equipment during the period April through July of 1979 was $ 597,278. According to Blumenthal, such amount represents 73 percent of the Honeywell list price of $ 820,889. [15]Blumenthal presented three different valuation methods and adopts the mathematical average of such methods as his opinion of the fair market value of the Equipment. The three methods and values are as follows: Method
Fair Market Value
Honeywell 4200 Historical Life
$ 504,515
1979 ATAS Report B
605,981  1979 Dealer "Ask" Price
681,338  The Honeywell 4200 was introduced in the year 1964. The technological life of the Honeywell 4200 was 13 years, such that the residual value was zero in the year 1977. Because the technological *702 life of the Honeywell 4200 had ended by the year 1977, the historical price data of the Honeywell 4200 did not accurately account for the price affect of the Honeywell policy adopted in 1975 which restricted software transfers and maintenance services to purchasers of Honeywell equipment in the secondary market. Blumenthal reviewed the transactional records of American Used Computers and determined that the costs incurred by users of Honeywell equipment acquired in the secondary market necessary to enhance and maintain such equipment were approximately 24 percent of the Honeywell list price. Blumenthal determined that the Honeywell-Finalco Software Agreement added 24 percent of the Honeywell list price to the fair market value of equipment subject to Finalco arranged leases. Blumenthal concluded that the extrapolated fair market value of the Equipment based on the Honeywell 4200 historical data available in 1979 was $ 504,515, or approximately 61 percent of the Honeywell list price. In 1979, ATAS prepared an analysis entitled "Report B: Current Status and Financial Future IBM System/370 (models 155 through 168) and IBM 3032" ("1979 ATAS Report B"). Based on the 1979 ATAS Report *703 B, Blumenthal concluded that the fair market value of the Equipment during April of 1979 was $ 605,981, or approximately 74 percent of the Honeywell list price. Lastly, Blumenthal based an opinion of fair market value upon a dealer "ask" quote in ATAS records in 1979 for a similar system with similar peripherals. The dealer "ask" quote was $ 681,338, or approximately 83 percent of the Honeywell list price. Dee Morgan ("Morgan") was qualified to testify as an expert on behalf of respondent. Morgan has worked for IBM as a systems service representative and for Burroughs Corporation as a technical service representative. From 1965 through 1983, Morgan was employed by the General Services Administration ("GSA") as a computer equipment analyst and data processing systems coordinator. While employed with GSA, part of Morgan's responsibilities involved providing estimates of residual value and economic life of computer equipment to the Defense Contract Audit Agency. Morgan determined the fair market value of the Equipment as of April 15, 1979, to be $ 420,399, or approximately 50 percent of the Honeywell list price. According to Morgan, her files contain a record that on August 4, 1977, a *704 Honeywell dealer in the secondary market quoted to her that 50 percent of the Honeywell list price was the fair market value of the Honeywell 66/20. Morgan stated that the negotiated price of Honeywell equipment in the secondary market was susceptible to a wide range of price negotiation due in part to the Honeywell restriction of software and maintenance. Morgan made no reference to the 1975 Finalco-Honeywell Software Agreement or the Finalco network of Honeywell users. Morgan stated that peripheral equipment was comparable to the IBM 370 Series introduced in 1971. Morgan stated that the used items of the Equipment were installed at the End User on December 19, 1974, and that the technological age of the entire Equipment dated to 1971 such that the peripherals were no longer state-of-the-art technology. Morgan concluded that the January of 1979 introduction of the IBM 4300 rendered the Honeywell 66/20 obsolete. Furthermore, Morgan maintained that the Honeywell 66/DPS was introduced in September of 1978 and that the Honeywell 66/20 was no longer available on new orders. Expert Testimony of Residual Value
Blumenthal used the three following methods to project the anticipated *705 residual value of the Equipment in April of 1986: Projected
Percent
Residual
of
Method
Value
List Price
Honeywell 4201-3 Life Curve
$ 210,617
26
Stanford Research Institute Report
82,089   10
1979 ATAS "Report B"
365,264  44
The Honeywell 4201-3 was introduced in the 1965. The Honeywell 4201-3 had an economic life of 12 years. Blumenthal extrapolated the life curve for the Honeywell 4201-3 and determined the residual value of the Honeywell 66/20 in the year 1986 would be two percent of the Honeywell list price. Blumenthal also determined that the residual value of a Finalco arranged lease of a Honeywell 66/20 should reflect additional residual value due to the Honeywell-Finalco Software Agreement and to account for the Finalco arranged network of maintenance services. Blumenthal increased the extrapolated value of the Equipment based on the Honeywell 4203-1 life curve by 24 percent of the Honeywell list price and concluded that the Equipment should expect a residual value of $ 210,617, or approximately 26 percent of the Honeywell list price. Blumenthal used as a second method of residual valuation the report prepared by the Stanford *706 Research Institute in the year 1975 (the "SRI Report"). The SRI Report included a graph titled "Used Computer and Peripheral Valuation Curves," which Blumenthal includes within his report. [16] Such graph indicates that as of 1975 the expected technological life of a central processor was expected to be 15 years. The SRI Report was prepared to value IBM equipment but was based upon a generic composite of computer transactions, surveys of brokers and dealers, and other industry publications. According to Blumenthal, it would have been reasonable in April of 1979 to rely upon the SRI Report to predict the residual value of the Equipment. The SRI Report indicates that in the year 1986, 12 years after the Honeywell 66/20 was introduced, the Equipment should expect a residual value of $ 82,089, or approximately 10 percent of the Honeywell list price. The SRI Report indicates that 15 years after the introduction of the IBM 370 in the year 1971, the Equipment should expect a residual value of $ 24,628, or approximately three percent of the Honeywell list price. Blumenthal did not increase the SRI Report based determination by the 24 percent factor of the Honeywell-Finalco Software Agreement. *707 Lastly, Blumenthal relied upon the 1979 ATAS Report B residual analysis. The 1979 ATAS Report B residual analysis concluded that large scale IBM mainframes have an average market life of 15 years and that the residual values of such equipment decline to 10 percent of list price as of the fifteenth year. As of 1979, Blumenthal stated that the Honeywell 66/20 and the IBM 370/158 were comparable computer equipment. Blumenthal factored 24 percent of the Honeywell list price value to reflect the Honeywell-Finalco Software Agreement and the Finalco maintenance network for services. Based upon the 1979 ATAS Report B, Blumenthal concluded that in April of 1979, it was reasonable to predict a 1986 residual value of $ 365,264, or 44 percent of list price. [17]
Blumenthal prepared a contingent rent analysis to project in April of 1979 the amount of contingent *708 Residual Revenue from equipment renewals pursuant to the Remarketing Agreement which petitioner may have reasonably expected to receive commencing on May 1, 1984. Blumenthal's contingent rent analysis is premised on the identical methods and the findings previously discussed to predict residual value as of April 30, 1986. The record is not clear as to the method employed to determine contingent rent based on the residual value. Blumenthal concluded that petitioner could reasonably expect to receive the following amounts of contingent rent for the period May 1, 1984, to April 30, 1986: Contingent
Method
Rent
Honeywell 4200 Life
$ 270,893
SRI Report
135,086  1979 ATAS Report B
402,237  Morgan concluded that as of December of 1979 the expected residual value of the Equipment would be zero at the termination date of the Owner Lease on April 30, 1986. Morgan determined that the residual value of the Equipment would have likewise been zero on April 30, 1984, the date the Residual Revenue provision regarding contingent renewal rents became effective. Morgan stated that a sporadic sale of the Honeywell 66/20 equipment may have been expected to occur but *709 that level of expected sales would not constitute a price platform. Morgan based her determination on the expected technological life of Honeywell Series 60 which was introduced in 1974 but which related back in technological capacity to the IBM 370 introduction date of 1971. Morgan reviewed the technological advancements of IBM during the period of 1971 through 1979. Morgan viewed the introduction of the IBM 4300 in January of 1979 to be critical to determination of any expected residual value of the Equipment in December of 1979. Morgan noted the increased price competition in memory capacity due to technological advancements and the 1975 Honeywell policy to restrict the transfer of software and maintenance. Morgan made no reference to the Honeywell-Finalco Software Agreement or the existence of a Finalco sponsored network of Honeywell maintenance services. Tax Reporting
Petitioner is a cash basis taxpayer reporting on a calendar year basis. Petitioner reported the following items with respect to the purchase and leaseback of the Equipment on his joint 1979 and 1980 Federal income tax returns: Equity
Net
Rental
Note
Installment
Income
Income
Depreciation
Interest
Note Interest
(Loss)
1979
$ 61,000
$ 152,568
-0-
$ 25,931
($ 117,499)
1980
91,500  108,010  $ 6,160
40,594  (63,264)   *710 For each of the calendar years 1981 through 1983, inclusive, petitioner reported on his Federal income tax returns a net loss from his equipment purchase and leaseback transactions with respect to the Equipment, as follows: Taxable Year Ended
Net Loss
December 31, 1981
35,766.85
December 31, 1982
18,232.35
December 31, 1983
68.02
For calendar year 1984 petitioner reported on his Federal income tax return taxable income from his equipment purchase and leaseback transaction with respect to the equipment of $ 83,935. As of the date of trial, Finalco projected that for calendar year 1985 petitioner should recognize taxable income from his equipment purchase and leaseback transaction in the amount of $ 84,352.54, plus any additional interim revenue sharing amounts pursuant to the Remarketing Agreement. OPINION The present case is a companion case selected as one of five representative test cases for a large number of dockets involving the investment in Finalco arranged sale and leaseback transactions of leveraged computer equipment. [18] The issues presented here are similar to those presented in the companion cases except that the transactional structuring *711 differed in certain pertinent respects. At the outset, we address respondent's primary assertion that petitioner's transactions with respect to the Equipment was a tax-avoidance scheme devoid of economic substance which is to be disregarded for Federal income tax purpose. Petitioner asserts that ownership of the Equipment for Federal income tax purposes has been established where petitioner entered the transaction with the requisite business purpose and the transaction was supported by economic substance. Taxpayers are generally free to structure their business transactions as they please, though motivated by tax reduction considerations. Gregory v. Helvering,293 U.S. 465 (1935); Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 196 (1983), affd. on this issue 752 F.2d 89 (4th Cir. 1985). *712 However, it is well settled that a transaction entered into solely for the purpose of tax reduction and which is without economic, commercial or legal purpose other than the expected tax benefits is an economic sham without effect for Federal income tax purposes. Frank Lyon Co. v. United States,435 U.S. 561 (1978); Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 196; Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1243 (1981). Nevertheless, the existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance. Frank Lyon Co. v. United States, supra;Estate of Thomas v. Commissioner,84 T.C. 412, 432 (1985). In the sale and leaseback context, we set forth a standard that the nonuser-owner recipient of tax benefits must specifically establish that the entry into the transaction was motivated by business purpose to justify the form of the transaction and that the transaction was supported by economic substance. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 201-203. [19] In Rice's Toyota World, Inc., we stated *713 that the tests developed under the sham transaction doctrine are applied to determine whether a threshold level of business purposes or economic substance is present. Rice's Toyota World, Inc.,81 T.C. at 196. [20]
Our inquiry of business purpose and economic substance is inherently factual as indicated in several recent cases concerning sale and leaseback transactions of computer equipment. Torres v. Commissioner,88 T.C. 702 (1987); Bussing v. Commissioner,88 T.C. 449 (1987), supplemental opinion 89 T.C.    (Nov. 24, 1987); Gefan v. Commissioner,87 T.C. 1471 (1986); Mukerji v. Commissioner,87 T.C. 926, 968 (1986); James v. Commissioner,87 T.C. 905 (1986); Coleman v. Commissioner,87 T.C. 178 (1986), *714 affd. per curiam 833 F.2d 303 (3d Cir. 1987); Estate of Thomas v. Commissioner, supra; Rice's Toyota World, Inc. v. Commissioner, supra.[21]
We noted in Rice's Toyota World that the drawing of a precise line of demarcation between valid and invalid transactions is invariably difficult. Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 197. In this context, petitioner bears the burden of proof as respondent's determination that the transaction was a tax-avoidance scheme devoid of economic substance is presumptively correct. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Based on our review of the record herein, we conclude that the transaction was not motivated by a business purpose and was devoid of economic substance. Consequently, the transaction is disregarded for Federal income tax purposes. The record clearly indicates that petitioner's entry into the transaction *715 at issue was contingent on the sale of his insurance business to RBH. RBH provided petitioner with a five-year executive employment contract with RBH to terminate in 1984. Murray prepared financial statements and advised petitioner in connection with the sale of his company. Murray's suggestion of an investment in a leveraged lease computer transaction was motivated by a desire to offset income generated by the sale of the insurance business to RGH and the related five-year employment contract. Petitioner consulted his broker with the investment firm of Merrill Lynch who advised petitioner that such firm did not recommend leveraged computer lease transactions due to the obsolescence factor inherent in the computer industry and the resultant uncertainty of residual value. Despite such advice, petitioner relied solely on the representations of Finalco and DuBois as to the fair market value of the Equipment as well as the residual value of the Equipment. We find petitioner's failure to seek an independent appraisal or other independent and reliable opinion of the fair market value and the *716 residual value of the Equipment to be an important factor indicative of the absence of the requisite business purpose. Petitioner had no knowledge of computer technology and was even, at trial, incapable of determining whether or not the Equipment included a central processing unit as incorrectly indicated in the Honeywell Bill of Sale. Petitioner made no effort to contact the End User or to examine the End User Lease. Petitioner's level of inquiry and the degree to which Murray was requested to assist in the Finalco transaction pales in comparison to the level demonstrated in the sale of his insurance business. We find that petitioner was motivated solely by the promised tax benefits of the transaction. The focus of our inquiry is to perform an objective analysis of the investment to determine whether any realistic opportunity for economic profit existed exclusive of the anticipated tax benefits. We analyze the transaction as a prudent investor, Rice's Toyota World, Inc. v. Commissioner,81 T.C. at 209, but we recognize that our determination cannot depend on unrealistic *717 demands for certainty. Gefen v. Commissioner,87 T.C. at 1492. The parties rely on the expert testimony to establish the fair market value and residual value of the Equipment as of June 1, 1979. We are not bound by the opinion of any expert witness when that opinion is contrary to our own judgment. Chiu v. Commissioner,84 T.C. 722, 734 (1985). We may embrace or reject expert testimony, whichever, in our best judgment, is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938); Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court. Based on our analysis of this investment, we determine that the transaction was not supported with economic substance. We are satisfied that the Equipment purchase price amount of $ 522,704 was its fair market value, although top of the line value in the market. Petitioner paid the Honeywell list price for the new items of the Equipment and 41 percent of the Honeywell list price for the used items of the Equipment. Morgan *718 determined that the fair market value of the Equipment was at most 50 percent of the Honeywell list price. Her finding comports with the purchase price of the used Equipment. While the prudent investor may not have paid the Honeywell list price for the new items of the Equipment in 1979, we do attach some significance to the fact that petitioner purchased an arranged leveraged lease investment subject to an end user commitment. See Mukerji v. Commissioner,87 T.C. at 965. Petitioner's assertion that the transaction was supported by economic substance depends on our determination of the Residual Revenue, as defined, to be expected at the termination of the Owner Lease and at the commencement of the Interim Revenue provisions. We found Blumenthal to be unpersuasive in each respect. Blumenthal determined that the Honeywell-Finalco Software Agreement and maintenance network warranted a uniform increase of 24 percent value. The record does not support such contention. Blumenthal failed to demonstrate that a uniform increase of 24 percent due to software and service is warranted where the inherent technology is obsolete at the commencement of the Interim Revenue *719 Period and at the termination of the Owner Lease. Pursuant to such view, the Equipment or any Finalco arranged Honeywell lease would not devalue to an amount less than 24 percent. [22] Blumenthal offered the Honeywell 4200 historical life method which indicated a residual value of two percent without the additional value and 26 percent with the additional value. We simply are not convinced as to the value of the Honeywell-Finalco Software Agreement which is pivotal in the assertion of Blumenthal. Blumenthal offered an opinion of residual value of 44 percent based on the IBM 370/158 as indicated in the 1979 ATAS Report B. Blumenthal stated that the IBM 370/158 and the Honeywell 66/20 were comparable equipment. Blumenthal included a *720 factor of 24 percent due to the Honeywell-Finalco Software Agreement and maintenance network which we have found to be not supported by the record. The record also indicates that the IBM 370/158 is a class 6 computer and that Honeywell 66/20 is a Class 5 computer. The average rental values and residual values are not comparable. The 1979 ATAS Report B indicates that the introduction of IBM 303X family of computers "terminated the economic market life" of the IBM 370. The 1979 ATAS Report B made no reference to the IBM 4300 announcement in January of 1979. For such reasons, we find that an assertion of 44 percent residual value of the Equipment is totally without merit and casts the testimonny of Blumenthal as incredulous. Blumenthal also offered the 1975 SRI Report. Based on an introduction date of 1974, the SRI Report indicates a residual value for the Equipment of ten percent. However, based on an introduction date of 1971, the SRI Report indicates a residual value of three percent. For reasons not clear in the record, Blumenthal did not factor an addition for the software agreement and maintenance network. For reasons discussed herein, we find the SRI Report to be the most *721 reliable source of opinion evidence as to residual value. Morgan determined a residual value of zero based on the technological life of the Equipment and technology achievement of IBM and Honeywell viewed as of June of 1979. Morgan concluded that the technological life of the Equipment commenced with introduction of the IBM 370 in 1971, not the Honeywell introduction date of 1974, due to the comparable technology of the IBM 370. We agree with her opinion to such extent. The record demonstrates the Honeywell was consistently out-distanced by the technology advancements of IBM. In 1979, few used equipment transactions for Honeywell equipment were evident in the trade journal Computerland. The Honeywell-Finalco software agreement and maintenance network cannot overcome the technology defect which rendered the Equipment obsolete at the commencement of the Interim Revenue period and at the termination of the Owner Lease. We find it inappropriate to extend the economic life, in other words the technology life, of the Honeywell 66/20 due to a delayed introduction date. We also found Morgan more credible with respect to the amount of Residual Revenue to be expected from renewals. *722 Morgan stated that the expectation of renewal rents depended primarily on the lease extension of the End User and that such occurrence was not guaranteed. Morgan indicated that extension of an end user lease did occur at times when an end user encountered difficulty in the installation of new equipment. In this instance, the End User converted to the new IBM 4331, a product of the IBM 4300 system introduced in January of 1979. The End User encountered difficulty in the conversion and was required to extend the lease. Based on the testimony of Morgan and known market conditions concerning Honeywell equipment, we find that in 1979 petitioner could expect insignificant Residual Revenue commencing in 1984. [23] We find that any significant Residual Revenue to commence in 1984 depended on the renewal of an end user who decided to defer the installation of new equipment as occurred here. We find no significant secondary market for the Honeywell Series 60 to exist in 1984 so as to expect the location of a different end use. *723 We determine that in 1979 it was reasonable to expect the Equipment to have a residual value of an amount not in excess of three percent based on the SRI Report after 15 years of economic life and that, in general, insignificant Residual Revenue from renewals could be expected to commence in 1984. Based on our determination, the transaction does not comport with economic substance even where we accept as reasonable the receipt of Residual Revenue actually received by petitioner.[24] Petitioner is entitled to deduct the interest paid on the Recourse Note during the years at issue. In Rice's Toyota World, the Court of Appeals of the Fourth Circuit held that a sham determination did not preclude the deduction of interest paid on a recourse installment note. Rice's Toyota World, Inc. v. Commissioner, 752 F.2d at 96. In Rose v. Commissioner,88 T.C. 386, 423 (1987), we accepted the view of the Court of Appeals for the Fourth Circuit.[24]
*724 By Amendment to Answer, respondent asserts the increased rate of interest provisions of section 6621(c) attributable to tax-motivated transactions. Respondent bears the burden of proof. Rule 142(a); Rose v. Commissioner, supra;Zirker v. Commissioner,87 T.C. 970 (1986). Section 6621(c) provides for an interest rate of 120 percent of the adjusted rate determined under section 6621(b) where there is a substantial underpayment in any taxable year attributable to one or more tax-motivated transactions. A substantial underpayment exists where such underpayment attributable to a tax-motivated transaction exceeds $ 1,000. Sec. 6621(c)(2). Section 6621(c) is applicable solely with respect to interest accruing after December 31, 1984, even though the transaction was entered into prior to the date of enactment of section 6621(c). Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). Respondent asserts the provisions of section 6621(c) are applicable because the *725 transactions at issue are defined as tax-motivated transactions where losses were disallowed by reason of section 465(a). Sec. 6621(c)(3)(A)(ii). We have determined that the Equipment transactions were tax-motivated schemes devoid of economic substance. Section 6621(c)(3)(A)(v) was added by Congress to specifically include within the definition of tax-motivated transactions "any sham or fraudulent transaction." [26] We have previously determined that "any sham or fraudulent transaction" within the meaning of section 6621(c)(3)(A)(v) includes a transaction which lacked subject profit motive and which was without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987). We have recently determined that the presence of profit motive does not preclude the determination that a transaction lacks economic substance and is, therefore, a sham. Cherin v. Commissioner, 89 T.C.    (Nov. 23, 1987). In this case, we determined that petitioner did not manifest a subjective profit motive and that the Equipment transactions were not supported with economic substance. *726 Consequently, petitioner is liable for additional interest on the substantial underpayment of tax attributable to a tax-motivated transaction within the meaning of section 6621(c)(3)(A)(v) where the Equipment transactions are transactions determined to be shams of fraudulent transactions. Decision will be entered under Rule 155.
Footnotes
1. Petitioner Charlotte Sturm was not involved in any of the transactions at issue and is a party to this action solely by reason of filing a joint Federal income tax return for each of the taxable years involved. Unless otherwise specified, petitioner shall refer only to petitioner Carlyle Sturm.↩
2. Unless otherwise indicated, all sections referred to are sections of the Internal Revenue Code of 1954, as amended and in effect during the years in question, and all rules referred to are rules of the Tax Court Rules of Practice and Procedure. ↩
3. Subsec. (d) of sec. 6621↩ was redesignated subsec. (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended. 4. The use of such terms as "purchase," "lease," and other like words does not imply that we consider the underlying transaction to be in fact construed as a "purchase" or "lease" for Federal income tax purposes. We probe beyond the labels given by the parties to determine whether an actual economic investment existed. Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 210 (1983), affd. on this ground 752 F.2d 89↩ (4th Cir. 1985). 5. The transactional documentation between Honeywell and Finalco indicates the following additional inaccuracies. The Honeywell Bill of Sale and the Honeywell customer invoice incorrectly indicated that the Sturm Equipment included model number DCF 6001 "System Console without CRT." The Honeywell invoice billed Finalco the amount of $ 240 for such item. The Honeywell Sale Agreement indicated that the Sturm Equipment included model number DCF 6001 "Speed Adapter" and indicated that Finalco pay the list price of $ 240. The Sturm Equipment in fact included the "Speed Adapter" as represented in the Honeywell Sale Agreement. The record does not indicate the list price of the "System Console without CRT;" however, the record indicates that the Sturm Equipment included a "Speed Adapter" and that Finalco paid list price. Additionally, the Honeywell customer invoice transposed the model number and the description of nine of 28 items referenced. Such transposition did not affect the amount billed to or the character of equipment purchased by Finalco. ↩
6. According to the representations of DuBois, petitioner should expect the following: ↩
Renewal proceeds
$ 19,000
Residual Value proceeds
85,000
$ 104,000
7. The Projection indicated that petitioner could expect renewal income of $ 25,000 in 1984 and $ 50,000 in 1985 and $ 50,000 in 1986. Such representation of DuBois is in contradiction to the representation communicated to petitioner that petitioner may expect 20 percent of the purchase price as a return including renewals which indicated that renewal income would be $ 19,000. See n. 6, supra.↩ Our conclusion is that DuBois was not informed as to realistic rental renewals to be expected and was primarily concerned with the sale of the tax benefits inherent in the leveraged computer lease programs. 8. Petitioner paid the annual installments pursuant to the Recourse note in full as follows: ↩
Payment
Interest
Principal
Date
Amount
Amount
Amount
May 29, 1980
$ 20,160
$ 6,160
$ 14,000
May 28, 1981
18,620
4,620
14,000
May 22, 1982
17,080
3,080
14,000
May 18, 1983
15,540
1,540
14,000
9. By letter dated July 21, 1981, DuBois-Schennum Assoc., Ltd., informed petitioner that Finalco "has eliminated your 10% expense for remarketing of your computer which they will absorb." Petitioner assumed Finalco had reduced the remarketing fee from 30 percent to 20 percent and returned, as directed, the Remarketing Agreement to DuBois-Schennum. The Remarketing Agreement was returned to petitioner without alteration. We are certain that the 10 percent expense to be eliminated referred to the remarketing expense evident in the Remarketing Agreement of certain companion cases. Lease Pro clearly did not examine petitioner's transaction prior to the mailing of the letter. Such is further incidence of the transactional carelessness evident in this record and the companion cases. ↩
10. The End User Lease provided monthly rental payments of $ 18,930 for 48 months to terminate April 30, 1983. The End User renewed the lease for a total of 23 months at $ 7,070.25. The renewal terms are not in accord with the End User Lease which provided three optional renewal schedules with reduced monthly rental based on length of renewal. The schedule that most resembles the terms of the End User renewal provided a renewal term of not less than seven months and not more than fourteen months at 50 percent of the basic monthly rent amount of $ 18,930. The record does not indicate the reason that Finalco renewed the lease for terms less favorable than those of the End User Lease. ↩
11. (Eight times $ 7,070.35) times 50/100. ↩
12. Generally, computer equipment can be divided into two broad classifications, peripheral equipment and mainframe or central processing equipment. Peripheral equipment refers to the equipment in a computer system which feeds information into and out of the central processor. The central processor is the "core" or "brain" of the computer which performs data processing functions. The Sturm Equipment includes such peripheral equipment as magnetic tape memory, disk memory, card and unit record devices, system main memory, and front end communications processing. ↩
13. The Computer Price Guide is a quarterly journal published by Computer Merchants, Inc. The Computer Price Guide was the computer industry's first regularly published source of price and market information for both new and used computer equipment and is widely relied upon in the industry. See Mukerji v. Commissioner,87 T.C. 926, 946-947↩ (1986). 14. American Computer Group includes two additional operating divisions. American Terminal Lease Corporation leases computer terminals and American Used Computers trades used computers in the secondary market. ↩
15. The Honeywell Sale Agreement indicates that the Honeywell lis price was $ 840,797 on April 30, 1979. ↩
16. The Stanford Research Institute graph is reproduced in our opinion of Rice's Toyota World, Inc. v. Commissioner,81 T.C. 184, 193 (1983), affd. in part, revd. in part 752 F.2d 89↩ (4th Cir. 1985). 17. The 1979 ATAS Report B indicates that the future residual value of 44 percent is $ 361,191. ↩
18. The companion cases are: Larsen v. Commissioner, 89 T.C.    (1987); Moore v. Commissioner,T.C. Memo. 1987-626; Shriver v. Commissioner,T.C. Memo. 1987-627; Casebeer v. Commissioner,T.C. Memo. 1987-628↩. 19. Carlson v. Commissioner,T.C. Memo. 1987-306↩. 20. The presence of business purpose does not entitle a transaction to be recognized for Federal tax purposes where objective indicia of economic substance indicating a realistic potential for economic profit are not manifest. Cherin v. Commissioner,↩ 89 T.C.    (Nov. 23, 1987). 21. Dobbs v. Commissioner,T.C. Memo. 1987-361; Kaufman v. Commissioner,T.C. Memo. 1987-350↩. 22. Blumenthal realized the fallacy of his determination at trial. In contradiction to his report, Blumenthal stated on direct examination that the value of the Honeywell-Finalco Software Agreement and maintenance service method would decline to ten percent over time. We find the attempt of Blumenthal to reduce the added value of the Honeywell-Finalco Software Agreement and maintenance network to ten percent to be arbitrary and not persuasive. ↩
23. The parties disagree as to the Lease referred to in the Remarketing Agreement. Respondent asserts that the Remarketing Agreement refers to the Original Term of the Owner Lease. Respondent asserts that the Remarketing Agreement entitled petitioner to 50 percent of the amount by which End User income exceeded Owner Lease rentals. Aggregate Owner Lease rentals were the amount of $ 91,500. Consequently, respondent asserts that petitioner was entitled to 50 percent of any rental income in excess of $ 91,500. Petitioner asserts that the Lease referred to in the Remarketing Agreement refers to the End User Lease such that petitioner is entitled to 50 percent of any rental income generated by Finalco after the 60th month of the Owner Lease. Finalco construed the Remarketing Agreement to refer to the End User Lease. Pursuant to Finalco's construction of the Remarketing Agreement, petitioner received $ 38,887 due to the End User renewal for 11 months during 1984 and 1985. The terms "Lease" as referred to in the Remarketing Agreement does not clearly indicate whether the Owner Lease or the End User Lease was intended. Respondent failed to question any witness with respect to whether the Owner Lease or End User Lease was intended. As stated, we believe that Residual Revenue from rentals depended primarily on the need of the End User to renew due to internal decisional factors. We do not believe that the computer secondary market for the Honeywell Series 60 provided a favorable opportunity to sell or re-lease the Equipment. While we suspect that in August of 1983, Finalco construed the terms of the Remarketing Agreement to refer to the End User Lease to provide window dressing to the transaction to avert an expected examination by the Internal Revenue Service, we perform an objective analysis based on the actual Residual Revenue received by petitioner. We note the issuance of our opinion in Rice's Toyota World, Inc.↩ followed shortly after the Finalco construction of the Remarketing Agreement terms. 24. Residual Revenue from sale (.03 x 840,747)
$ 25,222
Net Equity:
Equity Investment     $ 68,000
Cash Flow     7,840
Residual Revenue for Renewal     38,887
21,273
x1.20
Net Equity     $ 25,528
25,528
Initial Share     25,222
Balance Share (70 percent)     - 0 -
Finalco Share (30 percent)     - 0 -
Economic Profit:
Cash Flow     $ 7,840
Residual Revenue Rentals     38,887
Initial Share     25,222
Balance Share     - 0 -
Economic Profit     71,949
Equity Investment
$ 68,000
Recourse Note Interest
15,400
Total Investment  $ 83,400
n25 Dobbs v. Commissioner,T.C. Memo. 1987-361↩. 26. Pub. L. 99-514, sec. 1535(a), 100 Stat. 2085, 2750. ↩