956 F.2d 274
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
F. George LAVERNE; Gary M. Gustin; Deanne Gustin,
Petitioners-Appellants,
v.
COMMISSIONER INTERNAL REVENUE SERVICE, Respondent-Appellee.
 No. 90-70648.
 United States Court of Appeals, Ninth Circuit.
 Submitted Jan. 15, 1992.*
Decided March 2, 1992.
 
 1
 Before GOODWIN, FLETCHER and BRUNETTI, Circuit Judges
 
 
 2
 MEMORANDUM**
 
 OVERVIEW
 
 3
 This is an appeal from a Tax Court opinion deciding three consolidated test cases involving the deductibility of certain investments in limited partnerships known as Barbados No. 1 and Barbados No. 4. Two of the taxpayer petitioners appeal the Tax Court's decision; the third is not involved in this appeal because he resides outside the geographical boundaries and appellate jurisdiction of the Ninth Circuit.[1] The Tax Court found that the transactions at issue were "sham" transactions because they did not have economic substance beyond the creation of tax benefits. The Tax Court also upheld various negligence penalties and enhanced interest rates on the tax due, finding that the taxpayers should have been aware of the weak basis on which they claimed the tax deductions. We affirm.
 
 FACTS
 
 4
 The facts relating to these convoluted transactions are recounted in detail in the Tax Court opinion at 94 T.C. 637 (1990). The facts will be reviewed only generally here.
 
 
 5
 The primary transaction at issue here occurred in late 1982, when the appellants in this case, R. George LaVerne, and Gary and Deanne Gustin, (collectively, "taxpayers"), invested in "limited partnership units" in partnerships involved with the construction of a hotel and resort at an undeveloped site, "Admiral Beach," in Barbados. The partnership units were sold as part of a "Sun Package" in groups of four along with a "reservation privilege." The investments in the limited partnerships were found to be "sham" transactions by the Tax Court.
 
 
 6
 The limited partnerships ("The Barbados Partnerships") taxpayers bought into were obligated to purchase from the Bajan Development Company (the company that was to develop Admiral Beach) one "property interest" for each Sun Package sold. The property interests were essentially fee timeshare interests in the Admiral Beach resort. The Barbados Partnerships would later repackage the rights they acquired, and sell the repackaged interests to limited partners such as the taxpayers.
 
 
 7
 The interests purchased by the Barbados Partnerships included the right to occupy a suite in the yet to be built hotel. However, the Barbados Partnerships sold only a diminished version of such rights to the individual limited partners. When they purchased units in the Barbados Partnerships, taxpayers received a reservation privilege as part of each Sun Package. A reservation privilege entitled the holder to spend one week at the Admiral Beach resort during its first year of operation, slated to be 1984. Taxpayers could purchase additional reservation privileges in each subsequent year, but only if such privileges were offered for sale by Bajan Services, the corporation formed by the developers of Admiral Beach to act as general partner of the limited partnerships. However, Bajan Services was under no fixed obligation to sell future privileges. Also, if taxpayers did not purchase additional reservation privileges, their interests could be terminated by Bajan Services on payment of a nominal amount ($250).
 
 
 8
 The Sun Packages cost $8,000 in 1982. Five hundred was designated as a "capital contribution" and $7,500 was designated as the cost of the first year's reservation privilege. Reservation privileges were projected to cost $3,750 in 1983, and $4,250 in the years 1984, 1985, and 1986. After 1986 they were projected to cost $500.
 
 
 9
 The complicated financial and contractual structure of the Sun Packages mandated that, at best, investors in the partnership could recover their capital contribution plus 95% of the amounts paid for reservation privileges over the years. In any event, taxpayers could not recover any financial return (excluding tax benefits) on their contribution until 2037.
 
 
 10
 By signing the purchase form for the Sun Packages, the investors warranted that they were not "investing in a profit seeking venture, and that Pecuniary Profits are not possible as set forth in the Agreement [but they were] purchasing for the primary advantage of obtaining quality vacation accommodations and experiences at a potentially reduced cost."
 
 
 11
 Besides the supposed potential for cheap vacations many years down the road, there was another benefit to taxpayers: the immediate realization of an approximately $60,000 loss for each Sun Package purchased. The loss allegedly resulted from several occurrences. The Sun Package contract obligated The Barbados Partnerships to purchase a property interest from Bajan Services for each Sun Package sold. These property interests were sold to the partnerships for about $10,000 plus interest. About half of the money was paid up front and the rest was due over a 40-year term of deferred payments. The interest was calculated according to the Rule-of-78's, or sum-of-the-years digits method, although the payment schedule differed quite a bit from the rate at which the interest supposedly accrued. For example, this table sets out the interest accrual versus the schedule of payments for one partnership:
 
 
 12
 interest accrued payment due
 -------------------- -----------
1982 $91,600 1,825
1983 73,300 1,825
1984 55,000 1,825
1985 36,600 1,825
1986 18,300 1,825
1987 1,400 0
1987"2017 1,400 0
2018 1,400 64,280
2019 1,400 64,280
2020 1,400 64,280
2021 1,400 64,280
2022 1,400 64,280
 
 
 13
 When the partnership deducted the interest according to this schedule, which front loads the interest, it resulted in huge losses. These losses flowed through to the individual taxpayers, who were limited "partners" in the partnership.
 
 
 14
 The sales literature describing the Sun Packages emphasized the "potential tax deductions amounting to several times your purchase price." The literature said that The Barbados Partnerships anticipated "tax losses during the first five years of operation, substantial in amount, available to shelter the income of Sun Package Holders from other sources." The sales brochure included projected tax losses versus costs:
 
 
 15
 cost taxable income (loss)
 ------ ---------------------
1982 $8,000 (56,600)
1983 4,000 (47,600)
1984 4,250 (34,300)
1985 4,250 (21,400)
1986 4,250 ( 8,600)
 
 
 16
 The literature included a legal opinion from The Barbados Partnerships explaining the reasoning behind the potential tax deductions. The opinion noted potential problems with claiming the deductions, including a statement that "in circumstances where there is a lack of economic substance the courts have found such circumstances to be a 'sham' and have disallowed deductions." The Sun Package also provided that, "All of the expenses for legal fees of Sun Package Holders related to a challenge by the IRS of the interest deduction will be paid by BARBADOS."
 
 
 17
 Taxpayers Gary and Deanne Gustin relied on the opinions in the sales material when deciding to purchase the Sun Packages. Gary Gustin did call the IRS before purchasing the package. The agent said that he was not familiar with The Barbados Partnerships but that if the deal looked too good to be true it probably was. Taxpayer LaVerne, an attorney in general business practice, apparently showed the sales material to his tax advisor. His tax advisor stated that the partnerships appeared to be legitimate investments.
 
 
 18
 The Tax Court sustained the Commissioner's denial of the losses, finding the taxpayer's investments in the limited partnerships to be a "sham." The Tax Court also upheld the imposition of various penalties imposed on the taxpayers.
 
 DISCUSSION
 
 19
 I. The Tax Court's Finding that the Investments in the Partnerships Were "Sham" Transactions
 
 A. Standard of Review
 
 20
 We review de novo the legal standards the Tax Court applied in its decision. Casebeer v. Commissioner, 909 F.2d 1360, 1362 (9th Cir.1990). We review for clear error the Tax Court's ultimate conclusion, based on its findings of fact, that the transactions were shams. Id.
 
 B. Analysis
 
 21
 The appellants assert that the IRS is trying "to deny reality" and that the Tax Court was clearly erroneous in playing along. Taxpayers claim that the transactions involved here were genuine and not "shams." As is often the case, "Life in all its fullness must supply the answer to the riddle." Welch v. Helvering, 290 U.S. 111, 115 (1933).
 
 
 22
 It is well established that it is the substance of a transaction that is important for tax purposes. Thus, courts look to "the objective economic realities of a transaction rather than to the particular form the parties employed." Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). If a transaction has no practical economic effects other than the creation of income tax losses, it is considered a "sham" transaction that will not be given effect for income tax purposes. See Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir.), cert. denied, 488 U.S. 824 (1988).
 
 
 23
 To evaluate a transaction courts will consider both (1) whether the taxpayer had a subjective business purpose other than engaging in tax avoidance and (2) if objectively the transaction has any economic substance. See Casebeer, 909 F.2d at 1363. The Tax Court found that investments in The Barbados Partnerships had no economic substance and were shams.
 
 
 24
 This finding is not clearly erroneous. As appellants admit, the very terms of the investment contract prevented the investors from realizing a cash profit. Instead, appellants argue that "economic profit" would arise from the "right to take low cost vacations." As appellants themselves explain, however, this "profit" could not begin to be realized until 1997. Expert testimony estimated a week's rental in Barbados to be worth about $1,000. Yet, in the first five years, taxpayers would have to pay $24,500 for five one week rentals. After 1986, the week's rental cost would fall to about $500. Of course, at the time of the investment in 1982 the resort had yet to be built.[2] Furthermore, the investors had no guarantee that reservation privileges would even be offered after the first year.
 
 
 25
 The Tax Court made factual findings that the taxpayers lacked a genuine business purpose and that objectively the only economic benefit that the investment in the limited partnerships could produce was a tax benefit. We will not disturb these findings. This case resembles many other cases in which taxpayers invested in a scheme that lacked any realistic opportunity for economic profit other than through tax deductions. E.g., Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir.1990); Keane v. Commissioner, 865 F.2d 1088 (9th Cir.1989); Sochin v. Commissioner, 843 F.2d 351 (9th Cir.1988). We agree with the Tenth Circuit, which affirmed the Tax Court's ruling in a case arising out of the transactions at issue here. See Cowles v. Commissioner, No. 90-9021 (10th Cir. Dec. 4, 1991) (unpublished order).
 
 
 26
 Taxpayers also argue that the transaction at issue is that of The Barbados Partnership and that the Partnership incurred recourse debt. Elements of a transaction adjudged to be legitimate (not sham) include the existence of genuine indebtedness and economic substance. See Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1548-49 (9th Cir.1987). However, the Tax Court found it must also examine the investment of the partners in The Barbados Partnership. It found that investment to be a sham. The loans taken by the partnership, although ostensibly recourse as to the partnership, were nonrecourse as to the taxpayers. Thus, the taxpayers were not personally liable for the loans. Because the underlying transaction is a sham and the taxpayers did not incur any genuine debt due to the non-recourse nature of their obligation, the interest on these loans is not deductible. See Bail Bonds, 820 F.2d at 1549.
 
 
 27
 As a result of our affirmance of the Tax Court's finding that the investments in the limited partnerships were "sham" transactions, we do not reach the other arguments raised by the taxpayers that the rule-of-78's method of calculating the interest deductions was permissible.
 
 II. Penalties and Interest
 
 28
 The Tax Court also upheld the IRS's imposition of negligence penalties and enhanced interest rates on the amount of tax owed by taxpayers. We review the factual findings related to the imposition of penalties under the clearly erroneous standard. See Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir.1991).[3]
 
 A. Negligence Penalty Under I.R.C. § 6653
 
 29
 In accordance with § 6653(a) the IRS imposed a penalty on taxpayers for negligence in claiming the deductions from the loss incurred by The Barbados Partnerships. This assessment is presumptively correct. Allen, 925 F.2d at 353. "Negligence under section 6653 is defined as the lack of due care or the failure to do what a reasonable and prudent person would do under similar circumstances." Id. There is ample factual and legal support to uphold the Tax Court's findings.
 
 
 30
 Taxpayers stood to realize a tax loss almost eight times as much as their initial investment. This should have alerted a reasonable taxpayer to seriously question the transaction. See id. The promotional material emphasized the tax benefits, discussing high write-offs and sheltering income. Compare Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir.1988) ("discussions in the prospectus of high write-offs and risk of audits should have alerted taxpayers"). Furthermore, taxpayers should have known that they had no realistic opportunity to realize a business profit. Taxpayers should have independently and fully investigated the legality of taking these deductions before proceeding.
 
 
 31
 Taxpayers argue that they reasonably relied on the legal opinion in the promotional materials they were supplied. However, taxpayers were ill-advised to rely so heavily on the representations of the sellers of the investment. See Collins, 857 F.2d at 1386. The legal opinion they were supplied with, moreover, contained numerous explanations of potential problems. When purchasing the Sun Package, taxpayers explicitly agreed not to rely on the legal opinions and acknowledged the risk that any tax deductions might ultimately be denied. Taxpayers were negligent in not further investigating the deductions.
 
 
 32
 Appellant LaVerne, an attorney, allegedly sought the advice of his "personal tax advisor," who stated that he thought the investment appeared legitimate. However, in these circumstances this additional investigation is not enough to shield LaVerne from the negligence penalty. See Allen, 925 F.2d at 353-54; Collins, 857 F.2d at 1386.
 
 B. Substantial Understatement of Liability
 
 33
 The Tax Court upheld the imposition of an addition to the tax under § 6661 because taxpayers substantially underpaid their taxes.[4] The Tax Court found that the transactions at issue in this case were tax shelters because they were tax-motivated, sham transactions. See § 6661(b)(2)(C). For the reasons outlined in Part I of this decision, we uphold this finding by the Tax Court. Therefore, to avoid the substantial understatement penalty, taxpayers must show that there was substantial authority that led the taxpayers to reasonably believe that the tax treatment submitted was more likely than not the proper treatment. § 6661(b)(2)(C).
 
 
 34
 Taxpayers cannot make such a showing. Substantial authority is found " 'only if the weight of the authorities supporting the treatment is substantial in relation to the weight of authorities supporting contrary positions.' " Antonides v. Commissioner, 893 F.2d 656, 659 (4th Cir.1990) (quoting Treas.Reg. § 1.6661-3(b)(1)). Taxpayers assert that they relied on the legal opinion in the sales material. That opinion, however, did not adequately address the sham transaction issue. We agree with the Tax Court that taxpayers have not offered substantial authority to support the investment in The Barbados Partnerships as having genuine economic substance. Nor have we found any authority ourselves that would support such a position. We uphold the Tax Court's finding of substantial understatement.
 
 C. Accelerated Interest Rate
 
 35
 The IRS also applied an accelerated interest rate to the taxes owed because it found the substantial underpayment of tax resulted from a "tax motivated transaction." § 6621(c). A tax motivated transaction includes any "sham or fraudulent transaction." § 6621(c)(3)(A)(v). We are affirming the Tax Court's finding that the transaction in this case was a sham transaction. Therefore, the accelerated interest rate provision of § 6621(c) was properly applied. Skeen v. Commissioner, 864 F.2d 93, 96 (9th Cir.1989).
 
 CONCLUSION
 
 36
 We AFFIRM the decision of the Tax Court.
 
 
 
 *
 The panel unanimously finds this case suitable for decision without oral argument. Fed.R.App.P. 34(a); Ninth Circuit Rule 3(f)
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Circuit Rule 36-3
 
 
 [1]
 In the third taxpayer's appeal, in an unpublished disposition, the Tenth Circuit affirmed the Tax Court's determination that the transactions lacked economic substance and upheld the Tax Court's imposition of the various tax penalties. Cowles v. Commissioner, No. 90-9021 (10th Cir. Dec. 4, 1991)
 
 
 [2]
 The resort was built, but only included 16 one-bedroom suites, considerably less than the 635 originally planned. Perhaps predictably, the resort filed for bankruptcy protection in the years after 1982
 
 
 [3]
 Unless otherwise noted, all statutory citations in this Part will be to sections of the Internal Revenue Code (Title 26 of the U.S.Code) that apply to the transactions and penalties at issue
 
 
 [4]
 The Tax Court correctly granted the IRS's motion to increase the penalty to 25% of the tax due in accordance with 1986 amendments to the Internal Revenue Code. Omnibus Budget Reconciliation Act of 1986, Pub.L. No. 99-509, § 8002(a), 100 Stat. 1874, 1951 (1986)